IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KATHRYN COLFER, on behalf of herself and all others similarly situated, | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:25CV792 |
| CIOX HEALTH, LLC, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

In this putative class action, Plaintiff Kathryn Colfer alleges that Defendant Ciox Health, LLC, n/k/a Datavant, LLC ("Datavant") charged and collected fees that exceeded the statutory maximums set out in North Carolina's Medical Record Fee Act ("MRFA"), North Carolina General Statute § 90-411. Before the court is Datavant's motion to compel arbitration. (Docs. 8, 10.) Colfer has responded in opposition, and Datavant has replied.[1] (Docs. 18, 20.) For the reasons set out below, Datavant's motion will be granted.

## I. BACKGROUND

Colfer was injured in a motor vehicle collision on December

[1] Colfer has also requested leave to file a surreply. (Doc. 22.) That motion will be granted, and the court has considered the surreply (Doc. 23) in deciding Datavant's motion to compel arbitration. Datavant has, in the alternative, filed a motion to dismiss the complaint (Doc. 9), which will be denied as moot.

18, 2023, necessitating treatment by various medical providers. (Doc. 3 ¶¶ 32, 33.) She entered into a representation agreement with the Law Office of Gregory M. Kash (the "Kash Firm"), designating the Kash Firm as her agent for all matters relating to her personal injury claims arising from the collision. (Id. ¶¶ 35-36.) Pursuant to that representation, the Kash Firm, acting on Colfer's behalf, requested copies of her medical records from the medical providers who treated her after the collision. (Id. ¶ 37.) The medical providers, who had previously granted exclusive possession and control of Colfer's medical records to Datavant, used Datavant's services to locate and transmit Colfer's records to the Kash Firm. (Id. ¶¶ 34, 39.)

Datavant, formerly Ciox, allows users who request medical records to track, view, download, print, pay for, and securely store medical record requests via an opt-in online portal. (Doc. 8-2 ¶¶ 6-7.) The Kash Firm first created an account with Datavant (then still known as Ciox) and agreed to use its online portal for delivery of medical records in October 2018, approximately five years before it commenced its representation of Colfer. (See id. ¶¶ 20-21.) Those terms and conditions for use of the portal (the "2018 terms and conditions") provide in relevant part:

> 1. Authorization. CLIENT [i.e., the Kash Firm] affirms that it is authorized by law or by the subject patient to obtain, review and keep a copy of the subject patient's medical and other related records. . . . CLIENT unconditionally represents and warrants to CIOX

> that CLIENT: (i) has requisite authority to enter into this Agreement and obtain any and all medical records that CLIENT requests; and (ii) is not seeking any records for any illegal or unethical purpose.
>
> . . .
>
> 15. Arbitration. . . . These limitations apply to any claims against CIOX, its subsidiaries or affiliates, or any travel service providers or companies offering products or services through the site. Any dispute or claim relating in any way to your use of any CIOX Service, or to any software or services licensed, sold or distributed by CIOX or through the CIOX website will be resolved by binding arbitration, rather than in court[.] . . .
>
> . . . To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to the CIOX Legal Department at 925 North Point Parkway, Suite 350, Alpharetta, GA 30005.

(Doc. 8-2 at 17, 21.) Thus, they require that "you the individual end-user (hereinafter referred to as 'CLIENT'), agree to the terms and conditions as outlined in this agreement." (Id. at 17.) The parties do not dispute that references to "CLIENT" in the 2018 terms and conditions denote the Kash Firm.

On March 10, 2025, Datavant updated the terms and conditions of its online portal. (Id. at 8 ¶ 25.) The Kash Firm subsequently agreed to these updated terms and conditions (the "2025 terms and conditions"), which provided:

> 1. Authorization. USER [i.e., the Kash Firm] affirms that it is authorized by law or by the subject patient to obtain, review and keep a copy of the subject patient's medical and other related records. . . . USER unconditionally represents and warrants to DATAVANT that USER: (i) has requisite authority to enter into this Agreement, upload relevant documents to the DATAVANT

> portal and obtain any and all medical records that USER requests; and (ii) is not seeking any records for any illegal or unethical purpose.
>
> . . .
>
> 5. **Arbitration. . . . These limitations apply to any claims against DATAVANT or its current, future, or former subsidiaries or affiliates . . . Any dispute or claim relating in any way to USER'S use of any DATAVANT Service, or to any software or services licensed, sold or distributed by DATAVANT or through DATAVANT website, will be resolved by binding arbitration, rather than in court[.] . . .**
>
> **. . . To begin an arbitration proceeding, USER must send a letter requesting arbitration and describing USER'S claim to the DATAVANT Legal Department at 2222 W. Dunlap Avenue, Suite 250, Phoenix, AZ 85021 (or Legal@Datavant.com).**

(Doc. 8-2 at 27 (bold in original).) Thus, they require that "you the individual end-user (hereafter referred to as 'USER'), agree to the terms and conditions as outlined in this agreement." (Id. at 26.) The parties do not dispute that references to "USER" in the 2025 terms and conditions denote the Kash Firm.

The Kash Firm submitted requests for medical records to Colfer's medical providers in February 2024, April 2024, and April 2025. (Doc. 8-2 ¶¶ 29, 36, 43.) In each instance, the Kash Firm paid for and retrieved the requested records via Datavant's online portal. (Id. ¶¶ 33-35, 40-42, 47-49.) To retrieve the records from the first two requests, the Kash Firm again agreed to the 2018 terms and conditions. (Id. ¶¶ 35, 42.) To retrieve the records from the April 2025 request, it again agreed to the 2025

terms and conditions. (Id. ¶ 49.)

Although the Kash Firm paid the fees for the record requests on Colfer's behalf, Colfer agreed to reimburse the law firm for costs and expenses of the litigation. (Doc. 3 ¶¶ 49, 51.) Based on that agreement, she asserts individual and class claims under the North Carolina MRFA, the North Carolina Debt Collection Act, North Carolina General Statute § 75-50 et seq., and North Carolina's Unfair and Deceptive Trade Practices Act, North Carolina General Statute § 75-1.1 et seq. (Id. ¶¶ 73-95.) She also asserts individual and class claims for unjust enrichment, negligent misrepresentation and negligence per se, and ordinary negligence under North Carolina common law, and requests declaratory and injunctive relief. (Id. ¶¶ 96-131.)

## II. ANALYSIS

### A. Standard of Review

Datavant moves to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. (Docs. 8, 10.) The FAA establishes "a liberal federal policy favoring arbitration agreements." Goldman Sachs Bank USA v. Brown, 170 F.4th 249, 256 (4th Cir. 2026) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)). "When parties have entered into a valid and enforceable agreement to arbitrate their disputes and the dispute at issue falls within the scope of that agreement, the FAA requires federal courts to stay judicial proceedings and

compel arbitration in accordance with the agreement's terms." Murray v. United Food & Com. Workers Int'l Union, 289 F.3d 297, 301 (4th Cir. 2002) (citations omitted); see also 9 U.S.C. §§ 3-4. However, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960). The court must therefore determine whether parties have a valid and enforceable agreement to arbitrate. Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd., 944 F.3d 225, 234 (4th Cir. 2019).

The burden to establish that a binding arbitration agreement exists rests with the party seeking to compel arbitration. Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., 867 F.3d 449, 456 (4th Cir. 2017). The movant must demonstrate the following:

> (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of [a party] to arbitrate the dispute.

Adkins v. Lab. Ready, Inc., 303 F.3d 496, 500-501 (4th Cir. 2002) (quoting Whiteside v. Teltech Corp., 940 F.2d 99, 102 (4th Cir. 1991)). In examining whether an arbitration agreement exists, a court essentially applies the summary judgment standard to assess whether there is a genuine dispute of material fact regarding formation of the arbitration agreement. See Marshall v. Georgetown

Mem'l Hosp., 112 F.4th 211, 217 (4th Cir. 2024) (citing Rowland v. Sandy Morris Fin. & Est. Planning Servs., LLC, 993 F.3d 253, 258 (4th Cir. 2021)); Berkeley, 944 F.3d at 234. Once the moving party has met its burden, the nonmoving party must affirmatively demonstrate with specific evidence that there is a genuine dispute of material fact requiring trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986); see Drews Distrib., Inc. v. Silicon Gaming, Inc., 245 F.3d 347, 352 n.3 (4th Cir. 2001) (stating that a trial on the existence of an arbitration agreement is inappropriate where the party opposing arbitration fails to unequivocally deny that an arbitration agreement has been made). In making its determination, the court is entitled to consider materials beyond the complaint and its supporting documents. Berkeley, 944 F.3d at 234 (citation omitted).

**B. The Arbitration Provision**

The parties do not contest the existence of a dispute between them, the relationship of the transaction to interstate or foreign commerce, or Colfer's refusal to arbitrate the dispute. Datavant asserts that the Kash Firm's acceptance of Datavant's terms and conditions was done with Colfer's authority as her agent, such that Colfer is bound by the arbitration agreement as the principal. (Doc. 10 at 10-13, 16-21.) Although Colfer does not contest the existence of a written agreement containing an arbitration

provision which covers the dispute,[2] she argues that the agreement is solely between Datavant and the Kash Firm and cannot be used to compel her to arbitrate her dispute with Datavant. (Doc. 18 at 13-22.) She argues that the Kash Firm had neither actual nor apparent authority to bind her to the arbitration agreement. (Id. at 15-22.) Colfer further argues, and Datavant contests, that the arbitration agreement is illusory and therefore unenforceable. (Id. at 24; Doc. 20 at 6-8.)

Generally, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Int'l Paper Co v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 416 (4th Cir. 2000) (quoting United Steelworkers, 363 U.S. at 582). Courts reviewing arbitration agreements must "apply ordinary state law principles governing the formation of contracts, including principles concerning the 'validity, revocability, or enforceability of contracts generally.'" Muriithi v. Shuttle Exp., Inc., 712 F.3d 173, 179 (quoting Hill v. Peoplesoft USA, Inc., 412 F.3d 540, 543

[2] Datavant argues that the arbitration agreement's scope "clearly encompasses all of [Colfer's] claims." (Doc. 10 at 13-14.) Colfer does not contest this contention. Indeed, the arbitration provisions at issue compel arbitration of "any claims against" Datavant, its subsidiaries or affiliates and "[a]ny dispute or claim relating in any way to your use of any [Datavant] Service." See Drews Distrib., 245 F.3d at 350 (finding that an arbitration provision covering "'any controversy or claim arising out of or related to' that agreement" is a "'broad' one" and should be construed to cover the dispute at issue (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 398 (1967))).

(4th Cir. 2005)). Here, the 2018 terms and conditions state that Georgia law "will govern this Agreement and any dispute of any sort that might arise between you and [Datavant]," and the 2025 terms and conditions state that Arizona law "governs this Agreement and any dispute of any sort that might arise between USER and DATAVANT." (Doc. 8-2 at 22, 33.) In a diversity case, a district court will apply the choice of law rules of the forum state. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). North Carolina typically gives effect to contractual choice of law provisions. Tanglewood Land Co. v. Byrd, 261 S.E.2d 655, 656 (N.C. 1980). Datavant contends, and Colfer does not contest, that North Carolina's choice of law rules dictate that Georgia and Arizona law govern interpretation of the terms and conditions and her dispute. (Doc. 10 at 8.)

Recognizing that Colfer did not sign the contracts at issue, Datavant cites cases from Georgia and Arizona, as well as North Carolina, for the proposition that common law principles of contract and agency can bind nonsignatories to arbitration agreements. (Doc. 10 at 16-17 (citing Brown v. Centex Homes, 615 S.E.2d 86, 88 (N.C. Ct. App. 2005); Triad Health Mgmt. of Ga., III, LLC v. Johnson, 679 S.E.2d 785, 788 (Ga. Ct. App. 2009); Smith v. Pinnamaneni, 254 P.3d 409, 416 (Ariz. Ct. App. 2011) (additional citations omitted)).) Indeed, the Fourth Circuit has held that "a party can agree to submit to arbitration by means other than

personally signing a contract containing an arbitration clause." Schwabedissen, 206 F.3d at 416. Common law theories of agency and estoppel can apply to bind nonsignatories. Id. at 416-17.[3] And it is well settled that "a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'" See Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64 F.3d 773, 776 (2d Cir. 1995) (citation omitted); Schwabedissen, 206 F.3d at 417; McCarthy v. Azure, 22 F.3d 351, 356 (1st Cir. 1994) ("To be sure, the law recognizes certain contract and agency principles under which nonsignatories sometimes can be obligated by, or benefit from, agreements signed by others, and these principles can apply to arbitration provisions."); Barrowclough v. Kidder, Peabody & Co., Inc., 752 F.2d 923, 938 (3d Cir. 1985) ("[A] variety of non-signatories of arbitration agreements have been held to be bound by such agreements under ordinary common law contract and agency principles."), overruled on other grounds by Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1115 & n. 5 (3d Cir. 1993).

**C. Kash Firm's Agency**

Datavant argues that an arbitration agreement exists between

[3] The Fourth Circuit observed that the Second Circuit recognized five theories "'aris[ing] out of common law principles of contract and agency law' [which] could provide a basis 'for binding nonsignatories to arbitration agreements: 1) incorporation by references; 2) assumption; 3) agency; 4) veil piercing/alter ego; and 5) estoppel.'" Schwabedissen, 206 F.3d at 417 (quoting Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64 F.3d 773, 776 (2d Cir. 1995)).

itself and Colfer because Colfer alleges she retained the Kash Firm as her agent "for all matters relating to [her] personal-injury claims." (Doc. 10 at 10; Doc. 3 ¶ 36.) Because of this agency relationship, Datavant contends, when the Kash Firm retrieved Colfer's medical records from its online portal, it had actual and apparent authority as her agent to accept the 2018 and 2025 terms and conditions on her behalf, including their respective arbitration clauses. (Doc. 10 at 16-21.) Colfer responds that the plain language of both versions of the agreements shows that the Kash Firm was acting solely on its own behalf. (Doc. 18 at 13.) Datavant replies that both versions specifically warrant that the Kash Firm has been "authorized" by the "subject patient" to obtain the medical records requested, and that the Kash Firm has the "requisite authority to enter into this Agreement" and obtain the medical records requested. (Doc. 20 at 2.) Datavant construes this language to mean that the Kash Firm was acting in its representative and agency capacity for the "subject patient," i.e., Colfer, when it accepted each version of the terms and conditions when retrieving the medical records. (Id. at 3.)

Its merits aside, Colfer's argument that the Kash Firm lacked authority to enter a contract on her behalf is inconsistent with the allegations in her complaint. (See Doc. 3 ¶¶ 36, 37.) It is true that the Federal Rules of Civil Procedure permit alternative or inconsistent pleading, and "[d]ecisional law fully supports the

right of plaintiffs to plead alternatively, even if the theories are conflicting." Fed. R. Civ. P. 8(d)(2)-(3); Ocean Front Ave., LLC v. Assuredpartners of Va., LLC, No. 3:24-cv-106, 2024 WL 2786910, at *3 (E.D. Va. May 30, 2024). Nonetheless, "[i]t is fundamental to the law that parties cannot take inconsistent positions on the same basic issues." Brainware, Inc. v. Scan-Optics, Ltd., No. 3:11-cv-755, 2012 WL 3555410, at *4 (E.D. Va. Aug. 16, 2012); accord. Smart v. Decision On Mortg. Co., LLC, No. 10-cv-00320, 2011 WL 829212, at * 3 (D. Md. Mar. 7, 2011) (finding that "it is not acceptable to rely on one legal theory in the Complaint, and then an entirely different one in the brief"); Karanik v. Cape Fear Acad., Inc., 608 F. Supp. 3d 268, 291 (E.D.N.C. 2022) ("Although parties may plead inconsistent claims as alternative theories of liability, . . . the allegations in the complaint must support each theory.").

The attorney-client relationship is based on agency. Dunkley v. Shoemate, 515 S.E.2d 442, 444 (N.C. 1999). Colfer's substantive claims are predicated on the Kash Firm having incurred an injury while acting as her agent, by virtue of Datavant charging fees exceeding the cap imposed by the MRFA. (Id. ¶¶ 75, 76.)[4] Moreover,

[4] Indeed, if the Kash Firm had not been acting as Colfer's agent for the purposes of incurring a debt on her behalf, it seems unclear how Colfer would have standing to seek redress from Datavant for her injuries. Cf. Street v. Smart Corp., 578 S.E.2d 695, 698-99 (N.C. Ct. App. 2003) (upholding dismissal where a personal injury attorney brought a claim against a medical record company alleging an excessive fee in violation of state law on the grounds that the attorney was not the "real party

Colfer's complaint alleges that she retained the Kash Firm as her "agent for all matters relating to [her] personal-injury claims." (Doc. 5 ¶ 36.) According to the complaint, the Kash Firm sought Colfer's medical records "pursuant to that representation" because they "were necessary to investigate and prosecute [Colfer's] personal-injury claim." (Id. ¶¶ 37-38.) Thus, Colfer's argument that the Kash Firm was not her agent for the purpose of procuring her medical records from Datavant, including accepting the terms and conditions containing the arbitration provision, is not supported by the allegations in her own complaint. See Karanik, 608 F. Supp. 3d at 291.

**D. Actual Authority**

Datavant argues that the Kash Firm had actual authority as Colfer's agent to accept the terms and conditions and thereby bind her to the arbitration provision. (Doc. 10 at 16.) In response, Colfer argues that the Kash Firm had neither actual nor apparent authority to bind her in contract, and that therefore "she could not have been bound by the contract's terms even if the contract had been entered in her name." (Doc. 18 at 12.)

"Actual authority is that authority which the agent reasonably thinks he possesses, conferred either intentionally or by want of ordinary care by the principal." Harris v. Ray Johnson

---

in interest" because the attorney's clients remained liable for the costs incurred).

Constr. Co., 534 S.E.2d 653, 655 (N.C. Ct. App. 2000). Actual authority may be either express or implied. Vaughn v. N.C. Dep't of Hum. Res., 245 S.E.2d 892, 895 (N.C. Ct. App. 1978). "Actual authority may be implied by conduct of the principal amounting to consent or acquiescence." Parata Sys., LLC v. Navajo Health Found.-Sage Mem'l Hosp., Inc., No. COA08-793, 2009 WL 921115, at *3 (N.C. Ct. App. 2009) (citing Lucas v. Li'l Gen. Stores, 221 S.E.2d 257, 263 (N.C. 1976)).

In addition to its inconsistency with the basis for her claims for relief, Colfer's assertion that the Kash Firm was without actual authority as her agent to bind her to the arbitration provision lacks force. As previously stated, Colfer pleads that the Kash Firm, as her "agent for all matters relating to [her] personal-injury claims," procured her medical records from Datavant "[p]ursuant to that representation, and on [her] behalf." (Doc. 3 ¶¶ 36, 37.) As Datavant points out, Colfer does not allege that she refused to reimburse the Kash Firm for the disputed fees.[5] (Doc. 10 at 19.) There is therefore no suggestion that Colfer manifested to the Kash Firm that its acceptance of the terms and conditions in obtaining her medical records was without authority or outside the scope of the agency relationship. (Id.) Because

[5] Although Colfer contends elsewhere that her substantive claims can proceed because the Kash Firm's agreement with Datavant is "void" (Doc. 19 at 13), her claims nevertheless presume she is liable to the Kash Firm for reimbursement of a void contract.

Colfer's conduct therefore "amount[ed] to consent or acquiescence," "[a]ctual authority may be implied." See Parata, 2009 WL 921115, at *3.

Colfer advances several arguments to contest the Kash Firm's actual authority, none of which is persuasive. (See Doc. 18 at 15-19.) First, she points to the medical records release and her retainer agreement that the Kash Firm submitted to Datavant, arguing that these documents do not "convey[] the broad authority that [Datavant] would need to prevail." (Id.) Colfer asserts that "[t]his evidence controls over [Datavant's] interpretation of a single allegation from the Complaint." (Id.) But the agency relationship between Colfer and the Kash Firm is not merely a matter of Datavant's interpretation. It is a necessary predicate to all Colfer's claims for relief. The agency relationship concerning Colfer's personal-injury litigation is also the sole reason that the Kash Firm sought Colfer's medical records from Datavant.

Colfer next cites McKean v. GGNSC Atlanta, LLC for the proposition that "any manifestations of implied agency or apparent authority arising only through words or acts of [the purported agent] are insufficient to authorize a finding that an agency existed." (Doc. 18 at 17 (quoting 765 S.E.2d 681, 510 (Ga. Ct. App. 2014) (quoting Walker v. Williams, 341 S.E.2d 487 (Ga. Ct. App. 1986)).) However, more than the Kash Firm's "words or acts"

supports the existence of the agency relationship. See McKean, 765 S.E.2d at 510. For example, Colfer's retention of the Kash Firm to represent her in connection with her personal-injury litigation and her agreement to "reimburse [the Kash Firm] for all expenses incurred by it in the handling of the aforementioned matter [including] costs incurred in connection with the preparation, prosecution and handling of said claim" are "manifestations of implied agency" broad enough to cover the medical records request. (Doc. 18-1 at 6; see McKean, 765 S.E.2d at 510.) Indeed, the attorney-client relationship is founded on agency principles. These alleged manifestations are sufficient to support the conclusion that the Kash Firm had implied actual authority to act on Colfer's behalf in procuring her medical records from Datavant, and in so doing, to bind her to the arbitration provision.

Colfer next points to the communications between the Kash Firm and Datavant and between herself and Datavant as evidence that there was insufficient manifestation of authority. (Doc. 18 at 18.) However, implied actual authority rests on what the "agent reasonably thinks he possesses, conferred either intentionally or by want of ordinary care by the principal." Harris, 534 S.E.2d at 655. The relevant manifestations, therefore, for an analysis of implied actual authority are between Colfer and the Kash Firm.

Finally, Colfer objects to Datavant's citation of Jones v.

Bank of Chapel Hill for its discussion of the scope of authority of a "general agent." (Doc. 18 at 19; 1 S.E.2d 135, 137 (N.C. 1939) ("A general agent is said to be one who is authorized to act for his principal in all matters concerning a particular business or employment of a particular nature. . . . And it is the recognized rule that such an agent may usually bind his principal as to all acts within the scope of his agency including not only the actual authority conferred, but such as is usually confided to an agent employed to transact the business which is given to him to do[.]" (citations omitted).) Colfer argues that unlike the business entity in Jones that could "only act through its agents," she "is a natural person who has numerous dealings with numerous persons during her daily life, and it is not reasonable to infer that Mr. Kash or the Kash Firm was such a 'general agent.'" (Doc. 18 at 19.) This argument proves too much and misconstrues Datavant's assertions. For the Kash Firm to have authority as Colfer's agent to enter the arbitration agreement, it is not necessary to conclude that it was her agent with respect to all her "numerous dealings . . . during her daily life." (Id.) Rather, the Kash Firm's authority as her "agent for all matters relating to [her] personal-injury claims" allowed it to "bind [Colfer] as to all acts with the scope of [the] agency." (Doc. 3 ¶ 36; Jones, 1 S.E.2d at 137.)

Colfer's allegations in her complaint that the Kash Firm was her agent for "all matters relating to [her] personal-injury

claims," her agreement to reimburse the Kash Firm, her failure to object to the Kash Firm's having secured the records in connection with that representation, and her assertion that the Kash Firm paid the allegedly excessive fees "on [her] behalf" all establish that the Kash Firm had the requisite actual authority as her agent to bind her to the arbitration provision. (See id.; Doc. 3 ¶¶ 36, 37, 49, 51.)

**E. Datavant's Terms and Conditions**

Colfer contends that because "[t]he contracts at issue did not name [her] or even suggest that the Kash Firm was entering them as an agent," the contracts cannot now be enforced against her. (Doc. 23 at 2.) Datavant argues that its terms and conditions on their face "contemplate the agency relationship between the Kash Firm and its clients, including [Colfer]." (Doc. 20 at 2.)

While the terms and conditions contemplate an agency relationship may exist between the signatory and the "subject patient," they do not necessarily mandate one. For example, the Kash Firm could have sought medical records pursuant to an authorization from an individual who was the opposing party in litigation, even though the firm would not be that party's agent (i.e., if the Kash Firm had represented the defendant in Colfer's personal injury lawsuit but sought Colfer's records). However, this is not dispositive, as Colfer's own complaint demonstrates that she granted the Kash Firm actual authority to obtain her

records and thus to enter into whatever agreement that reasonably fell within the performance of that representation.

### F. Whether the Agreement Is Illusory

Finally, Colfer argues in the alternative that the arbitration agreement is illusory and therefore unenforceable because, by its terms, it may be amended or modified at any time. (Doc. 18 at 24.) Colfer cites a decision from the Fourth Circuit, applying Maryland law, for the proposition that "[a] promise to arbitrate is illusory if a party can 'alter, amend, modify, or revoke the Arbitration Policy . . . at any time with or without notice.'" (Id. (quoting Coady v. Nationwide Motor Sales Corp., 32 F.4th 288, 292 (4th Cir. 2022)).) Because Datavant has reserved such a right, Colfer argues, "it can suddenly change the terms of the agreement to avoid arbitration," such that it can unilaterally hold its counterparty "to the promise to arbitrate while reserving its own escape hatch." (Id. (quoting Kaatz v. Rainguard Brands, LLC, No. 1 ca-cv 24-0286, 2025 WL 213849, at *3 (Ariz. Ct. App. Jan. 16, 2025)).)

But Kaatz is distinguishable. It involved an arbitration provision in an employee handbook that purported to reserve the right to unilaterally change it "without the consent or agreement of any employee" and thus apply new provisions retroactively. Kaatz, 2025 WL 213849, at *3. Here, the arbitration provision merely states that Datavant reserves the right to later amend its

arbitration agreement and that the parties agree that further use of the Datavant website constitutes acceptance of any changes, which will be accessible either on the client's account or the footer pages on the company's website. (Doc. 8-2 at 20, 31.) The terms and conditions further provide that it is the responsibility of the user "to check this Agreement periodically for changes." (Id.) In effect, the terms and conditions provide that the Kash Firm, if it objects to a modification, may terminate its portal account and thereby refuse to accept the modified terms. (Id. at 17, 20, 26, 31.) The Kash Firm's ability to reject any modifications functions as a limit on Datavant's right to amend the agreement. Courts applying Georgia law have found that limitations on a party's otherwise unilateral right to amend an arbitration agreement are sufficient to defeat a charge that such agreements are illusory and unenforceable. See Anderson v. AIG Life & Ret., 199 F. Supp. 3d 1371, 1379 (S.D. Ga. 2016) (finding, pursuant to Georgia law, that mutually enforceable arbitration provisions in employment agreements where the employer's right to amend the agreement was limited); cf. Kaatz, 2025 WL 213849, at *3 (holding, pursuant to Arizona law, that an arbitration provision that reserved the unilateral and unlimited right to change the agreement "without the consent or agreement of any employee" was illusory and unenforceable).

Thus, Datavant cannot bind a user to a unilateral change to

the terms of the agreement without the user's consent, nor can it hold the user "to the promise to arbitrate while reserving its own escape hatch." See Kaatz, 2025 WL 2133849, at *3. As Datavant notes, this is also consistent with decisions in the federal courts of this state. (Doc. 20 at 6; see, e.g., Abdullah v. Duke Univ. Health Sys., Inc., No. 5:09-cv-8-fl, 2009 WL 1971622, at *4-5 (E.D.N.C. July 8, 2009) (rejecting argument that arbitration provision that "may be periodically amended" was illusory, citing cases); Mkt. Am., Inc. v. Chuanjie Yang, No. 1:17-cv-897, 2018 WL 3406865, at *8 (M.D.N.C. July 12, 2018) (finding arbitration term that permitted the agreement to be "periodically amended" not illusory).) The agreement therefore is not illusory and is not unenforceable on this basis.[6]

**III. CONCLUSION**

For the reasons stated, Datavant has met its burden to show that Colfer is bound by the valid agreements to arbitrate contained in Datavant's 2018 and 2025 terms and conditions.

IT IS THEREFORE ORDERED that Colfer's motion to file a surreply (Doc. 22) is GRANTED, the motion to compel arbitration (Doc. 8) by Defendant Datavant, f/k/a Ciox Health, LLC, is GRANTED,

[6] Because the court finds that Colfer is bound by the arbitration provision pursuant to the common law theory of agency, it need not reach Datavant's alternative argument based on the doctrine of estoppel. (See Doc. 10 at 21.)

and the case shall be STAYED while the parties are directed to submit to arbitration.

IT IS FURTHER ORDERED that Datavant's motion to dismiss (Doc. 9), raised in the alternative, is DENIED as moot.

IT IS FURTHER ORDERED that the parties shall provide a status report of the arbitration every 120 days, starting from the date of this Order.

/s/ Thomas D. Schroeder
United States District Judge

September 30, 2026